of America. We have Mr. Hood here for the appellant and Ms. Aveda here for the United States. Mr. Hood is up first and he has reserved three minutes for rebuttal. Thank you, your honors, and may it please this court, my name is Chris Hood. I represent Dr. Alan Turnham, his spouse Rebecca Turnham, and his medical practice, the Turnham PA. The government's evidence is too thin, too misconstrued, misconstrued by it, I mean, and misapprehended by the district court based on the government's misconstruing the record to affirm summary judgment. And in those instances where it hasn't misconstrued the evidence, there isn't any. They're showing it's nonexistent. I'll urge the court to join me now and examine their key exhibits, the three of them. Document 4518, we'll start. The U.S. says that this shows, in effect, that employers in the plan had individual bank accounts in the plan which they controlled and which they could draw on. That's not true. The record refutes it. Mr. Bleiweiss, our witness, at document 48-1, his affidavit states that employers cannot direct payments as shown in this exhibit of the government, 4518. The exhibit shows that the payment was taken by the plan, again, taken by the plan from, quote, the reserve, unquote, a phrase which isn't defined in the exhibit. And it did so because the employer, the Beeman Company, had failed to pay its premium. The plan has discretion to do exactly that. The employer doesn't. The plan says in article 3, section 3.5, which you'll find at document 45-2 at 5, that the plan may terminate an employer that fails to pay its contribution. We all know may means may or may not. The plan chose not to terminate, acting in accordance with article 3, section 3.5, taking the premium from the reserve instead. This exhibit of the government shows only that. It doesn't show a bank account controlled by the employer for its own use to pay its current expenses. The employer can't cure a failure to pay its contribution on time by ordering the plan to make the payment late from its reserve or any reserve. Only the plan can do that. It has the discretion to terminate for failure to pay or it has the choice not to do so. The government hasn't shown otherwise, hasn't shown anything about this section in the plan about termination. We respectfully submit that document 45-18 doesn't bear the government's interpretation, which again, they say it's effectively a bank account an individual employer controls for its own use and benefit. It's not true. Document 45-19, Doctors Loser and Spagnola. Mr. Bleiweiss explains this exhibit and a small number of other instances as a resolution of a filed lawsuit. It's not the payment of benefits under the plan. It's extra outside the plan. Counselor, this is Judge Ray. If I could ask a question about that. I don't have an understanding about what kind of lawsuits we're talking about. It seems the government's position is that the lawsuits themselves are simply a muse for employers or employees to be able to get their money back. Your Honor, respectfully, I think that allegation of collusion like that should be directed in the first instance court where the government says that occurred. There is no record of the lawsuits. The government did not respond to the Bleiweiss affidavit on that point by pointing to lawsuits or any evidence of collusion. Mr. Bleiweiss says there's 15 instances out of 400 employers where something occurred that we had to resolve or settle a claim or lawsuit. Those are the only instances that account for any payments to a living participant. The government, just by the way, only cites to Dr. Loeser and Spagnola and then also to a company called Kaycon and Exhibit 4520, which I'll turn to in a minute. Out of 400 employers, they have only these two instances. The one instance with Loeser and Spagnola at 4519 and then the one at 20. That's only 0.5% of 400 employers. It's less than 1%. Two instances. They claim that this establishes substantial similarity. In fact, I think it proves overwhelming dissimilarity, 99% dissimilarity between our plan, Dr. Turnham's transaction, and these two instances. Again, I can't answer about an allegation of collusion on the part of an employer who is not Dr. Turnham's PA. Respectfully, that would be the burden on the government. Prosser tells us that the government bears the burden in a penalty case, not the taxpayer. District Court, unfortunately, didn't correctly ascertain the correct rule of decision and apply it. The government invited that error in their summary judgment brief by citing a case out of the 11th Circuit called Central Bank, which is only a tax refund case, not a penalty case. Mr. Hood, this is Judge Newsom. Can I ask you a question about sort of the prospect or likelihood of what I'll call cash out? I mean, it seems to me that this is one of the key disputes that you've teed up in your briefs. The plan document, on the one hand, says that benefits payable under the plan are not subject to alienation sale transfer, but it goes on to say that the participant can designate a beneficiary and give up his right subsequently to change the beneficiary. It seems to me that in the 7th Circuit case and the V's marketing case, that's pretty much exactly how the participants of this very plan cashed out. I recognize that your expert, Mr. Weber, said sort of notwithstanding the plan documents, there's no way to cash out. But how can he testify to that when the plan document, at least as understood by the 7th Circuit, seems to say precisely the opposite? Well, first of all, and thanks for the question, Judge Newsom, I don't construe V's as saying the plan document enables conversion. We quote the plan document 45-2 extensively in our brief, and the language of the plan document we quote proscribes conversion. The V's marketing taxpayer testified a couple things about getting payments while he was alive. One, he said it was a medical reimbursement expense I was told I could get while I was alive, which is inapplicable in our case, no evidence of that. And then the court says about the money policy, later turned into a fidelity policy, that the money was paid out to the V's marketing plaintiff. But I don't recall the V's marketing court citing a plan provision which enabled that payment. I understand that to be part of the 15 instances that Jeff Bleiweiss testifies to that were outside the plan. Is there a particular part of the plan language that you're citing that conveys to you that conversion is enabled? Because I don't see it anywhere in the plan, Your Honor. Well, I guess what I'm thinking is that, and you can please, you undoubtedly understand the plan better than I do, but that there is a clause in the plan that allows the designation of a beneficiary, and that I thought that the V's marketing court said that that is how the participants of that plan were able to cash out, to designate a beneficiary, a willing, sort of, it turns it into a marketable asset. Well, granted, a life insurance death benefit has to be paid to someone alive to be a beneficiary. And so Dr. Turnham designates, just like the V's marketing plaintiff did, as I understand it, you change a beneficiary once you alienate or hypothecate or convert the policy into a cash settlement. And according to the language I quote in our brief from the plan, that's not possible. And of particular relevance, Dr. Turnham's understanding and knowledge of his transaction is the opposite of that. No alienation, no conversion. And I say that Dr. Turnham's knowledge and understanding is relevant here, despite the government's argument that it is irrelevant, because they hold out V's marketing for that very thing. They say the V's marketing taxpayer was told he could convert and alienate cash out, and that he understood and did so. And then they tell you to decide this case and that case. Forgive me, I'm sorry, Your Honor. Valerie was just telling you that you've got two minutes left. Thank you. They ask this court to ignore my taxpayer's testimony of his knowledge and understanding, and rely instead on the testimony of another taxpayer in another case about his understanding and knowledge. And I find that conspicuous and telling, and I'd urge the court not to adopt that position urged on it by the government. But, again, the plan document proscribes alienation and conversion. Dr. Turnham said, I can't do it. And, in fact, the ambiguous testimony that the district court found compelling enough to grant summary judgment on, inside that, Mr. Hobbs himself acknowledges that there's no conversion possible. I urge the court to read that ambiguous testimony as carefully as we have and to see where that occurs. Mr. Hobbs says at one point there is no conversion possible. He posits instead that there's a forfeiture value possible, not conversion. And we say the plan language prescribes forfeiture and surrender as well, and Dr. Turnham's knowledge and understanding is the same. No access to his contributions except as a death benefit paid to his beneficiary. And if he lives long enough, then he is tax disadvantaged altogether by the transaction. Not tax advantaged, but tax disadvantaged. Another point the government would like you to pass over and not pay attention to. And with that, I'll cede the rest of my initial argument and allow, or invite any additional questions. Okay, very well, hearing none, you have three minutes for rebuttal. We'll hear from Ms. Avetta for the government. Thank you, Your Honors, and may it please the court, Julie Avetta for the United States. We've just heard a whole lot of really precise detail at great length about the language of a plan, and it's important to keep our focus on what this case is really about, which is not the language of the plan at all. This is a case, as the district court held, about a tax form, and specifically about whether a taxpayer who participates in an abusive transaction that resembles something that the IRS has designated as one to watch must file a disability tax return. And that is a very broad standard. It is not granular. It does not depend on how familiar the individual taxpayer is with the niceties of the plan, with the provisions of the plan documents, with the marketing materials of the plan. It has to do with whether the plan itself, as generally administered, is substantially similar to a transaction that the IRS has listed. And here it has. It has listed that transaction in Notice 95-34, and that notice prescribes six potential similarities that should put you on notice that this is a transaction that the IRS is looking at. And if you file the form, now the regulation says, construe the term substantially similar broadly in favor of disclosure. And there's no penalty if you file the disclosure form. You're not exposed to any potential 6707A penalty, which is the penalty that we're discussing here. If you fulfill your statutory obligation, file the form, and disclose your participation in a plan that the IRS might want to look at, you then give the IRS the opportunity to look at it. And if your participation in the plan is legitimate, if, as my opponent has contended, the plan is materially different from the one that the IRS has listed, then you're fine. Then you are permitted to participate in it. Your deductions are allowed. And the deductions, by the way, are not at issue here. They are still being litigated in a pending tax court case. Today we're talking solely about whether Dr. Turnham and his PA had a duty to file a form disclosing their participation in this plan. Ms. Aveda, this is Judge Newsom. So forgive my hang-up, I guess, on sort of the cash-out piece of this, but it seems to me like maybe the most pointed dispute between you and Mr. Hood is about the possibility of cash-out. Can you kind of help me understand sort of what the plan documents say about cash-out and what the evidence here reveals about cash-out? Well, yes. But first I would note that even if everything that Taxpayers' Council says about cash-out is correct, the remaining balance of the factors that would trigger the obligation to disclose under the Treasury regulation in Notice 95-34 are not here. So even if it's completely correct and there is no cash-out option, the duty to disclose would still have been triggered by enough of the other factors. Now, addressing your question, the trust administrator advised at least some employees that they could get benefits by selling their share of the annuity for cash value. That's a finding by the district court. And we have evidence of that in the record. The individuals that are identified in Exhibits 4519 and 4520 were so told. And they were also allowed, as is evident on the record in these marketing as well, to reach in to the funds that they had deposited in the annuity and direct the use of those funds. And our evidence discloses that as well. And there was no error in the district court's interpretation of that evidence, which is, again, consistent with these marketing. Now, if we're splitting hairs over whether a settlement is prompted by litigation or prompted by a request or to resolve a dispute or simply to respond to an inquiry, I submit that we've gone too far because the query here is far more basic. Are these transactions substantially similar? And look at the other factors that show that they are. You are looking at, first of all, is your plan invested in variable life or universal life insurance contracts on the lives of covered employees? This plan was. This plan expressly said this is a combination of a group term plan plus a group annuity, which is effectively a universal life policy in all but name. And the district court observed this. The district court in these observed this. The Seventh Circuit in these observed this. This is all about the same plan, by the way. We're not citing to these because its evidence is relevant to this taxpayer's knowledge. We are citing to these because it's the same plan. And the question before the court is whether that plan, this same plan that we're looking at here, is sufficiently similar to the abusive transaction described in Notice 9534 to trigger the reporting obligation. And the evidence here is overwhelming that it was because we read that similarity broadly in favor of disclosure. You've got the universal life insurance contract. You've got an insurance policy owned by the trust. You've got large employer contributions relative to the amount of term insurance that would be required to provide the death benefits under the arrangement. Here you have a remarkable split where 97% of the cash paid into this plan funded an investment vehicle while only 3% of it paid insurance premiums. Whether there's a question on the point whether a trust administrator may obtain cash by cashing in or withdrawing value from the insurance policies does not defeat summary judgment on the question of whether the rest of the plan resembles this notice enough to trigger the disclosure obligation. The key factor that these courts found and that the district court here agreed with was that the trust maintained a separate accounting of assets by employer. The benefits that a participant would receive would be correlated to what they paid in, and that is called experience rating, and that's an absolute no-no in these. It's what makes the transaction abusive. It changes it from insurance where your risk is pooled and everyone who pays in is entitled to equal treatment to more participation in a mutual fund where you get back what you pay in. And that is in evidence here. It is clear from both what the district court considered here and the experience of other participants in these and the testimony of the insurance representatives, even on this record, that accounts were kept by employer, employee contributions were tracked, and the parties were at all times aware of who they were paying And I don't know if that speaks to your point, Judge Newsom, about withdrawing of value from the policy, but these courts were certainly persuaded that the ability of a party to reach in and touch their money and apply it as they directed is not like life insurance if you or I were to purchase it. We cannot call up the insurance company and say, Oh, take something from here and move it to there. It's not a fund manager. But this plan is much more akin to one. And that's why taxpayers were. Thank you, President. Ms. Savetta, hi. This is Judge Ray. I wanted to ask you a question about that point. So there was the testimony in the record, I guess it was Fidelity, who said that they kept this information as an accommodation for the participants or the company's employers. And I'm less than clear on exactly what that accommodation was for. Was there any explanation of that in the record below? Not that I am aware of, Your Honor, but the presumption that the court took from it was that they're accommodating the needs of the participants to access their funds and track their contributions and track the progress of the benefits that they were accruing. And there is a point of evidence in the record, which has already been cited, where a party had, at their own direction, funds transferred from the investment vehicle out into the insurance, onto the insurance side of the plan to pay a premium, which is the equivalent of you're buying insurance and you stop paying your premiums, but within the insurance your premiums manage to continue to be paid on demand. And that is enough to make the IRS suspicious. That's enough to make the IRS say, is this really insurance or is this an investment vehicle? Are you really doing a 419 plan here? A 419 plan says that the welfare benefits under a 419 plan are not eligible for favorable treatment if they are property under Section 83 of the Internal Revenue Code or deferred compensation under Section 404 of 5 of the Internal Revenue Code. So your ability to withdraw value from that can be potentially deferred compensation and can even be property, depending on the form in which you are taking that value. And that's why we need disclosure. That's why you need to file the form. And again, when you file the form, maybe this all checks out. Even if you credit all of the evidentiary points that the taxpayer is raising here, you still do not avoid the obligation to disclose the transaction. Whether or not the plan differs on the merits from the listed transaction, to the extent that these taxpayers were doing just fine here and are entitled to all of the deductions that they claimed, is not material. It's not the determination that the court needs to make here. How this taxpayer felt about the plan, what he believed, what he was told, what he understood, is not material to this case at all. That's evidence for the tax court proceeding where he is litigating the deduction. This is a case about whether he should have told the IRS what he was doing. And the district court made no errors in concluding that he should have. And if the court has no further questions, I will yield back my time and ask that you affirm the correct decision of the district court. Thank you. Ms. Avetta, thank you so much. Mr. Hood, you've got three minutes remaining. And if I could, just at the outset, can you address Ms. Avetta's point? You can tell that I've got a hang-up about cash-out or forfeiture, but forfeiture value, I mean. But can you address her point that she mentioned at the outset in response to one of my questions, that even if I am hung up about cash-out, that the other factors weigh strongly enough in favor of substantial similarity that cash-out can't overcome them? Yeah, I can, Your Honor, and thank you for the question. I'm surprised to that statement. We say in our reply brief that the government runs away from the 11 or 12 criteria published in the notice, the guidance 9534. They hung their arguments in the district court on conversion and on experience rating. We showed in our brief, we put in evidence controverting all 11 or 12 of the criteria. And we have affirmative showings on all of them. And so if it's a rule of six out of 11 carries the day, we win, because they're absent on many of the criteria, most of them. I agree with you that conversion, the ability of a living employee to somehow access these contributions instead of the purpose of providing a death benefit to its beneficiary, is a key issue here, because it defeats the purpose of the 419 exemption, which is to provide bona fide insurance to smaller employees in a welfare benefits plan. And so we stand on our showing there. Experience rating is another criterion, and I heard my colleague on it, and I urge the court to look at the enabling CFR, the IRS regulation for Section 419, which is 26 CFR 1.419AF6. And it's subpart B23 of that regulation. The IRS tells taxpayers and professionals exactly what experience rating is, because what the government says it is in this case, and they're showing below, is not experience rating. They have shown you only some bookkeeping, some ledgering, conducted by Fidelity Insurance, which was not done at the request of the administrator, an error that the government invited below. Counsel, this is Lisa Branch. Let me ask, why not... Opposing counsel got up and said, this is about filing this disclosure form. If it's substantially similar, go ahead and file the disclosure form, and then the IRS will look into it. And if it's not an abusive vehicle, then no problem. Why not just file the form? The argument is that any taxpayer out of caution, like a defensive driver, should file this form. The problem with that is, according to the government, the liability to failure to file is for merely the potential of having an abusive transaction. Why not just file the form? Well, there's no guidance. 9534, according to the court, according to the government, the courts uphold penalties for failing to file outside the four corners of the document. So there's not only no guidance, taxpayers have to be soothsayers. They have to read the crystal ball that belongs and is stored in the IRS headquarters in Washington. The veteran may have access to it, but taxpayers don't. And so that's a dire position, that you ought to be able to forecast what we're going to say a listed transaction is four and five years after the fact, when we say to you, your honors, to this court, that we don't even abide by our guidance. We don't count it. We're prompting you not to pay much attention to it. That's what they said in their brief. I urge the court to look at V's Marketing. V's Marketing had a medical reimbursement benefit that was cashable and accessible to the living employee. That is the opposite of what this plan provides. There is no plan provision that provides for a medical reimbursement benefit. The fact that that's in the V's Marketing case proves that the provisions of the plan in V's differ from the plan provisions we've exhibited to this court. In this case, the government chose not to give you the V's Marketing plan. I don't know why. They failed their burden of production. Thank you again for this opportunity, your honors. Mr. Hood, thank you so much. Ms. Aveda, thank you as well. That case is submitted.